**RAILWAY LABOR EXECUTIVES ASSOCIATION, et al., Plaintiffs–Appellants,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant–Appellee.**

**No. 87–1323.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1987.

Decided Nov. 17, 1987.

Lawrence M. Mann, Alper & Reiser, Washington, D.C., for plaintiffs-appellants.

Linzey D. Jones, Sidley & Austin, Chicago, Ill., for defendant-appellee.

Before HARLINGTON WOOD, Jr., FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Railway Labor Executives Association, et al. ("the unions") appeal from the district court's denial of their motion for a preliminary injunction and its grant of summary judgment for Norfolk and Western Railway Company ("N & W"), 659 F.Supp. 325. This appeal turns on whether the dispute between the unions and N & W is a major or minor dispute for purposes of Sections 2, Seventh, 3 and 6 of the Railway Labor Act. 45 U.S.C. §§ 152, Seventh, 153 and 156 (1982). The unions sought to enjoin N & W's imposition of a drug screen urinalysis as part of its routine employee medical examinations. The district court concluded that the unions' claim constituted a minor dispute and thus was subject to the exclusive jurisdiction of the National Railroad Adjustment Board. The district court therefore denied the unions' motion for a preliminary injunction and granted N & W's motion for summary judgment. We affirm.

## I.

In October, 1984, N & W's medical department added a drug screen urinalysis test to all routine employee medical examinations. N & W employees are required to undergo medical examinations on a regular basis, and employees must pass such a physical examination before they can return to work following a furlough or other extended absence. The purpose of these medical examinations is to insure that employees are physically fit for their jobs. With the exception of the recently implemented drug screen urinalysis, the unions have never objected to these routine physicals or to any other specific test employed as part of these examinations.

For at least the past twenty years, N & W employees have been required to provide a urine specimen to the examining doctor during their medical examination. The urine sample is tested to determine the level of albumen, or sugar, in the employee's body. Since October, 1984, however, N & W has also sent a portion of the same urine sample to a drug testing center where it is tested for evidence of drug use by the employee.[1] If the laboratory tests reveal the presence of drugs, N & W notifies the employee that he or she cannot return to work until he or she provides a urine sample that tests negative for drugs. The employee is given 45 days from the date of notification to provide a clean, drug-free urine sample. If he or she fails to provide a clean sample within the 45 day period, N & W can dismiss the employee for failure to obey instructions. The employee may return to work immediately after a drug-free urine sample is provided.

Alternatively, an employee who tests positive for drugs may elect to participate in the Norfolk Southern Drug and Alcohol

---

1. From October, 1984 through October, 1985, employees were not permitted to return to work until N & W received the results of the drug screen urinalysis. That policy was changed on October 18, 1985, and employees are now permitted to return to work pending N & W's receipt of the drug test results.

Rehabilitation Services Program ("DARS"). An employee who participates in this program is not required to submit a clean urine sample within the 45 day time limit. Rather, employees who participate in the DARS program are given five days from the end of the program in which to provide a drug-free sample.

N & W began notifying the unions and the N & W employees of its new drug testing program shortly after it began implementing these tests in October, 1984. On March 25, 1986, the unions filed this action in the district court seeking to enjoin N & W from continuing to conduct drug tests on its employees. The unions alleged that N & W's unilateral addition of the drug screen urinalysis to all routine employee medical examinations constituted an unlawful unilateral change in the employees' "working conditions" in violation of Section 2, Seventh and Section 6 of the Railway Labor Act ("RLA"). 45 U.S.C. §§ 152, Seventh and 156 (1982).[2] The unions asserted that the district court had jurisdiction over their claims because they constituted a major dispute under the RLA. N & W moved for summary judgment on the ground that the district court lacked subject matter jurisdiction because the un-

ions' objections to its drug testing program were a minor dispute and thus within the exclusive jurisdiction of the National Railway Adjustment Board ("NRAB") pursuant to 45 U.S.C. § 153 (1982).[3] The district court held that the dispute was minor and therefore granted N & W's motion for summary judgment and denied the unions' motion for a preliminary injunction. The unions appealed to this court. Because we conclude that the unions' objection to N & W's drug testing program constitutes a minor dispute, we affirm.

## II.

### A.

■ The primary issue on appeal is whether the unions' objection to N & W's unilateral addition of a drug screen urinalysis to its routinely required employee medical examinations constitutes a major or a minor dispute for the purposes of the Railway Labor Act. The distinction between major and minor disputes, although imprecise, *see Local 553, Transport Workers Union of America v. Eastern Airlines, Inc.*, 695 F.2d 668, 673 (2d Cir.1983), is essential because it determines the proce-

2. Section 2, Seventh of the Railway Labor Act provides that:

No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

45 U.S.C. § 152, Seventh (1982).

Section 6 of the Railway Labor Act provides that:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within thirty days provided in this notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates or pay, rules, or working conditions shall not be altered by the carrier until the controversy has been

finally acted upon as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

45 U.S.C. § 156 (1982).

3. Section 3 of the Railway Labor Act provides for the establishment of the NRAB, and defines the disputes within the NRAB's jurisdiction:

(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, or working conditions, including cases pending and unadjusted on June 21, 1984, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the dispute.

45 U.S.C. § 153 (1982).

dures the parties must follow to resolve their dispute. If a dispute is major, the parties must attempt to resolve it through negotiation, mediation and possible presidential intervention. *See Railroad Trainmen v. Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344, *reh. denied*, 394 U.S. 1024, 89 S.Ct. 1622, 22 L.Ed.2d 51 (1969). If a major dispute cannot be resolved, the union can strike in support of its position. *National Ry. Labor Conference v. International Ass'n of Machinists and Aerospace Workers*, 830 F.2d 741, 745 (7th Cir.1987); *Chicago and North Western Transp. Co. v. International Bhd. of Electrical Workers, Local Union No. 214*, 829 F.2d 1424, 1428 (7th Cir.1987). If a dispute is minor, the parties first must attempt to resolve their dispute through negotiation. If negotiation fails, however, the parties must submit their minor dispute to the National Railway Adjustment Board for resolution. *Labor Conference*, at 745; *Atchison, Topeka and Santa Fe Ry. v. United Transp. Union*, 734 F.2d 317, 320 (7th Cir.1984). The NRAB's jurisdiction over minor disputes is exclusive. *Andrews v. Louisville and Nashville Ry.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). A minor dispute cannot be the subject of a strike. *Local Union No. 214*, at 1428; *Brotherhood of R.R. Signalmen v. Burlington Northern R.R.*, 829 F.2d 617, 619 (7th Cir.1987); *Atchison*, 734 F.2d at 320.

The terms "major" and "minor" dispute do not appear in the Railway Labor Act. The Supreme Court created this distinction to explain the difference between challenges under Sections 2 and 3 of the RLA. *Elgin, Joliet and Eastern Ry. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), *aff'd*, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). In *Elgin*, the Supreme Court defined major and minor disputes as follows:

> The first [major] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.
>
> The second class [minor], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

*Id.* at 723, 65 S.Ct. at 1290. In short, "[a] minor dispute is a dispute over interpretation of an existing contract; a major dispute is an attempt to create a contract or change the terms of a contract." *Local Union No. 214*, at 1427.

To ascertain if a dispute is major or minor, the court must determine whether or not the dispute can be resolved by reference to an existing collective agreement. If, as here, the parties disagree as to whether or not reference to their existing agreement can resolve the dispute, "the dispute is minor unless the carrier's claims of contractual justification are 'frivolous' or 'obviously insubstantial.'" *Atchison*, 734 F.2d at 321; *see also Brotherhood of Maintenance of Way Employees v. Burlington Northern R.R.*, 802 F.2d 1016, 1017 (8th Cir.1986); *Chicago and Northwestern Transp. Co. v. United Transp. Union*, 656 F.2d 274, 279 (7th Cir.1981). The court does not consider the merits of the underlying dispute; its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision.

The primary objectives of the RLA are to promote stability in labor relations in the railroad industry and prevent strikes.

*Detroit and Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 154, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969); *Leu v. Norfolk and Western Ry.,* 820 F.2d 825, 827 (7th Cir.1987). Because a major dispute can escalate into a strike, if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor. *Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Ry.,* 768 F.2d 914, 920 (7th Cir.1985).

### B.

■ To determine whether the dispute in this case is a major or minor dispute, this court must refer to the parties' existing collective bargaining agreement. The unions' existing written agreement with N & W neither permits nor prohibits routine medical examinations of N & W employees. A written agreement, however, does not necessarily contain all relevant working conditions. *Shore Line,* 396 U.S. at 153–54, 90 S.Ct. at 301–02. Within the railroad industry in particular, it is common practice to omit from written agreements non-essential practices that are acceptable to both parties. *Id.* at 154, 90 S.Ct. at 301. The parties' collective agreement, therefore, includes both the specific terms set forth in the written agreement and any well established practices that constitute a "course of dealing" between the carrier and employees.[4] *Id.* at 153–54, 90 S.Ct. at 301; *Rail-*

*road Signalmen* at 620; *Leu* at 829; *Railway Labor Executives Ass'n v. Atchison, Topeka and Santa Fe Ry.,* 430 F.2d 994, 996 (9th Cir.1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). Because the parties' agreement is silent on the issue of employee medical examinations, we must determine whether or not these routine physicals are a mutually acceptable implied working condition within the parties' course of dealing.

■ N & W has conducted routine medical examinations to determine employees' fitness for work for at least the past twenty years. The unions have never objected to N & W's requirement that all employees routinely undergo these physical examinations and that all employees returning from furloughs or other extended leaves of absence pass a medical examination before they return to work. Further, the unions have not previously objected to any specific test conducted as part of these examinations. In fact, both parties agree that the medical examinations are part of their agreement and that N & W has authority to determine when and how they should be conducted.

The district court concluded that N & W's routine employee medical examinations constitute an accepted implied working condition and that they are entitled to implied contractual status. The content of the parties' agreement is a factual question.

---

**4.** This court has recently indicated that the impact of past practices on the characterization of a dispute as major or minor should be limited in some circumstances. *Labor Conference,* 830 F.2d 741, 746–47 (7th Cir.1987). In *Labor Conference,* the court concluded that "it is apparent that arguments from past practice may be relevant to the characterization of a dispute as major or minor, but it is also true that they will most often have only a limited impact on the characterization." *Id.* at 747. Similarly, in *Brotherhood Ry. Carmen v. Norfolk & Western Ry.,* 745 F.2d 370, 376–78 (6th Cir.1984), the court refused to permit the appellant to introduce evidence of the parties' past practice in an effort to contradict the language of their written agreement. The Carmen argued that the evidence of past practices would support their claim that their dispute with N & W was a major dispute. The Court in *Carmen* distinguished *Shore Line* by reading *Shore Line* as limited to issues regarding the scope of a proper

status quo injunction in a major dispute. *Id.* at 376. Further, the court noted that the parties' agreement in *Shore Line,* unlike the agreement in *Carmen,* was silent on the issue in dispute.

We agree with the court's conclusion in *Carmen* that parties cannot use evidence of past practices to contradict the explicit language of their written agreement in an effort to change the characterization of a dispute as either major or minor. This, however, is not that case. The written agreement between N & W and the unions in this case is silent on the issue of employee medical examinations. As a result, the only available evidence of the parties' agreement that can be used to characterize their dispute as either major or minor is evidence of their past practices. The concerns raised by the court in *Carmen* and *Labor Conference* are thus irrelevant in this case and the district court properly relied on evidence of the parties' past practices relating to employee medical examinations.

Therefore, we review the district court's holding on a clearly erroneous standard. *Brotherhood of Maintenance of Way Employees v. Chicago and Northwestern Transp. Co.*, 827 F.2d 330, 334 (8th Cir. 1987). In light of the parties' past practices, the district court's conclusion that the routine medical examinations are an implied working condition is not clearly erroneous. Thus, in determining whether the unions' dispute with N & W is major or minor, we consider the employee medical examinations to be part of the parties' agreement.

### C.

Having concluded that the routine medical examinations are part of the parties' agreement, we must determine if N & W's unilateral imposition of drug testing constitutes a major or minor dispute. To make this determination, of course, we must refer to the parties' agreement. The dispute must be considered minor as long as N & W's assertion—that its agreement with the union justifies its unilaterally imposed drug testing program—is not frivolous or obviously insubstantial. *Atchison*, 734 F.2d at 321. Whether N & W's interpretation of its agreement is frivolous or obviously insubstantial is a question of law which we review *de novo. Brotherhood of Maintenance of Way Employees*, 827 F.2d at 334.

For the past twenty years N & W has unilaterally determined what tests are administered as part of all employee medical examinations and the union has not previously objected to N & W's control over the content of these examinations. The parties do not dispute that the purpose of the medical examinations is to determine whether an employee is physically fit to perform his or her job. N & W argues that the new drug screen urinalysis is simply an additional method of insuring that employees are fit for their jobs. Therefore, N & W argues, because the union has never objected to the requirement that all employees provide a urine sample during their physical examination, its implementation of a second test performed on this same urine sample is authorized by the parties' agree-

ment. N & W asserts that this dispute can be resolved by reference to the parties' existing agreement and therefore it is minor and must be submitted for resolution to the NRAB.

The unions argue that N & W's drug testing program, if utilized merely as an additional test to determine an employee's fitness for his or her job, cannot possibly be justified by reference to the parties' agreement. The unions argue that none of N & W's previous medical examination tests intruded into the employees' conduct of their private lives. Drug tests, on the other hand, are designed to examine an employee's conduct outside of work that may, or may not, also occur while the employee is on the job. It is this intrusiveness that the unions argue makes the drug screen urinalysis a radical departure from the parties' past practices and thus a major dispute. The unions assert that N & W's claim—that the parties' agreement justifies unilaterally imposed drug testing—is frivolous and obviously insubstantial.

■ We reject the unions' argument and hold that the drug screen urinalysis, unilaterally imposed by N & W as part of all employee medical examinations, is a minor dispute. We cannot say that N & W's reliance on the parties' agreement for authorization of its drug testing program is "frivolous" or "obviously insubstantial." *Atchison*, 734 F.2d at 321. The parties' past practice has been to accord N & W unilateral authority to determine the appropriate tests to conduct during required medical examinations. The addition of a drug screen as a second component of the urinalysis previously required of all employees does not constitute such a drastic change in the nature of the employees' routine medical examination or the parties' past practices that it cannot arguably be justified by reference to the parties' agreement. Our holding in this case is in accord with the United States Court of Appeals for the Eighth Circuit's recent decision in *Brotherhood of Maintenance of Way Employees v. Burlington Northern R.R.*, 802 F.2d 1016 (8th Cir.1986). In *Brotherhood of Maintenance of Way Employees*, the

carrier unilaterally added both mandatory medical examinations and a drug screen urinalysis as part of that examination for all employees returning from furlough or other extended absence. The court held, with one dissent, that the union's objection to Burlington Northern's drug testing program constituted a minor dispute. *Id.*

In the present case, however, it is important to emphasize what we are not deciding. We are not deciding that N & W's drug testing program is justified by its agreement with the unions. The NRAB, not this court, has exclusive jurisdiction to decide the merits of this case. We merely hold that N & W's argument that the parties' agreement justifies its drug testing program is not frivolous or obviously insubstantial. *See United Transp. Union General Comm. of Adjustment v. Baker,* 499 F.2d 727 (7th Cir.), *cert. denied,* 419 U.S. 839, 95 S.Ct. 69, 42 L.Ed.2d 66 (1974). The unions' objection to N & W's drug testing program therefore constitutes a minor dispute.

### D.

The unions also assert that N & W's drug screen urinalysis was designed in part to detect Rule G violations. Rule G is part of N & W's Operating and Safety Rules and prohibits the use or possession of drugs or alcohol on the railroad's property.[5] The railroad has always relied upon sensory observations by N & W supervisors to detect Rule G violations. The district court concluded that the addition of the drug screen urinalysis to N & W's

routinely required employee medical examinations was designed to ensure that employees are fit for their jobs, not as a means of detecting Rule G violations. Thus, the district court found that N & W had not made any unilateral changes in the enforcement of Rule G. This is a finding of fact which we will not overturn unless clearly erroneous. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The clearly erroneous standard does not permit this court to reverse the district court's factual findings merely because we are convinced that we would have decided the issue differently. *Id.* The district court's finding that N & W's drug testing program is not used to enforce Rule G can only be clearly erroneous if this court reviewing the entire record is "left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). We are not convinced that a mistake was made.

■ There is no indication in the record, and the unions do not argue, that N & W is imposing drug testing on a random basis. Rather, the tests are administered only during regular medical examinations or following an on-site accident involving an employee in which there is evidence suggesting that the accident was related to the improper use of drugs or alcohol.[6] Further, the actions N & W takes as a result of a Rule G violation and a positive drug

---

**5.** Rule G provides:

> An employee who reports for duty under the influence of alcohol or other intoxicant, cannabis in any form, an amphetamine, a narcotic drug, a hallucinogenic drug, any controlled substance (as defined by federal law), or a derivative or combination of any of these, or who uses any of the foregoing while on duty, will be dismissed. Possession of any of the foregoing while on duty, or possession, use, or being under the influence of any of the foregoing while on Company property or occupying facilities provided by the Company, is prohibited.

**6.** This case is unlike *Brotherhood of Locomotive Engineers v. Burlington Northern R.R.,* 620 F.Supp. 163 (D.Mont.1985), *appeal pending,* No.

85–4138 (9th Cir. argued July 8, 1986) ("BLEI"). In *BLEI,* Burlington Northern unilaterally adopted a new program to detect Rule G violations. The new detection program included the use of "sniffer dogs" to detect the presence of drugs. Employees were subjected to random "dog sniffs" and were dismissed automatically if they refused to submit to the random search. *Id.* at 166–67. The district court in *BLEI* held that the union's objection to Burlington Northern's new program was a major dispute and enjoined Burlington from enforcing its policy and using random dog sniff searches. In this case, unlike *BLEI,* N & W has not instituted any new program designed to detect Rule G violations, nor has N & W employed any type of random drug testing.

test are significantly different. An employee who violates Rule G is subject to immediate dismissal. An employee who tests positive for drug use, on the other hand, is given 45 days within which to demonstrate that his or her system is drug-free by providing a clean urine sample; or the employee can elect to participate in the DARS treatment program. Once a clean sample is provided, the employee may return to work. An employee can be dismissed following a positive drug test only if he or she does not provide a clean sample within the established time limit.

In light of these facts, the district court's finding that N & W's drug testing program was not implemented as a means of detecting Rule G violations is not clearly erroneous. We need not determine, therefore, whether the unilateral imposition of a drug screen urinalysis as a means of detecting Rule G violations would constitute a major or minor dispute.

### III.

The unions also argue that even if their dispute is minor, this court should issue a preliminary injunction enjoining N & W from conducting drug testing on its employees until their dispute is submitted to the NRAB for resolution. The unions claim that a preliminary injunction is necessary to preserve the jurisdiction of the NRAB and to prevent irreparable harm to those employees tested for drugs in the interim. We decline to issue a preliminary injunction.

A minor dispute, such as this one, falls within the exclusive jurisdiction of the NRAB. As a result, although a court retains the power to issue a preliminary injunction, the court's power is limited. "The traditional power to enjoin under equitable principles remains, but in the usual case it is inappropriate to exercise this power since irreparable loss and inadequacy of the legal remedy cannot plainly be shown until the NRAB has had an opportunity to act." *Brotherhood of Maintenance of Way Employees v. Burlington Northern R.R.*, 802 F.2d 1016, 1021 (8th Cir.1986). It is appropriate for a court to issue a preliminary

injunction in a minor dispute only when an injunction is needed to preserve the NRAB's jurisdiction, i.e., to prevent a minor dispute from growing into a major dispute before the NRAB has an opportunity to resolve the dispute. *See National Ry. Labor Conference v. International Ass'n of Machinists and Aerospace Workers*, 830 F.2d 741, 749 (7th Cir.1987) (the court's authority to issue a status quo injunction in a minor dispute is limited).

█ There is *no indication* here that the dispute between the unions and N & W is likely to develop into a major dispute before it is presented to the NRAB for resolution. The unions were informed that N & W had begun drug testing of employees in October, 1984 but did not file this lawsuit until March 25, 1986. During that time period, drug screen urinalyses were conducted on N & W employees without the dispute developing into a major one. Further, the unions cannot make a showing of irreparable loss or inadequacy of legal remedy in this case until the NRAB has resolved their dispute. It would therefore be inappropriate for this court to take the unusual step of issuing a preliminary injunction in this minor dispute and we decline to do so.

### IV.

We hold that the unions' objection to N & W's unilateral addition of a drug screen urinalysis to all required employee medical examinations constitutes a minor dispute within the exclusive jurisdiction of the NRAB under the Railway Labor Act. We therefore do not reach the question of whether the unions' objection to N & W's drug testing program is barred by the statute of limitations. The unions' request for a preliminary injunction pending consideration of this dispute by the NRAB is denied. The district court's denial of the unions' motion for a preliminary injunction and grant of N & W's motion for summary judgment is AFFIRMED.